BROWN, Circuit Judge,
concurring in part and dissenting in part from Part II:
While the Court’s ultimate conclusions .follow inexorably from its broad reading of the Military Extraterritorial Jurisdiction Act (“MEJA”), 18 U.S.C. §§ 3261 et seq., the Court’s initial premise seems faulty. MEJA was amended in 2004 to close a loophole that allowed non-Department of Defense (“DOD”) contractors to escape criminal liability for crimes committed overseas. I agree Congress used “deliberately expansive” language in MEJA so contractors working to support the DOD in its mission would not escape prosecution for crimes committed while performing their duties, regardless of which federal agency was their employer. See Maj. Op. at 780-81. However, I am not convinced that any federal contractor whose employment relates—even minimally—to the DOD’s mission is automatically subject to MEJA. The Court’s interpretation unnecessarily broadens that which the statutory language seems designed to limit.
I.
A.
When interpreting a statute, the analysis begins'—-and often ends—-with its text. See, e.g., Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). Here, the text of MEJA extends the jurisdiction of federal courts to crimes committed in foreign countries if the crime was committed while the defendant was “employed by ... the Armed Forces outside the United States.” 18 U.S.C. § 3261(a)(1). The statute further defines the time period of being “employed by the Armed Forces outside the United States” to include acts committed while a person is the employee of a contractor of “(I) the [DOD] ...; or (II) any other Federal agency ... to the extent such employment relates to supporting the mission of the [DOD] overseas .... ” 18 U.S.C. § 3267(l)(A)(iii). Thus, by MEJA’s plain terms, the employee of a DOD contractor is automatically subject to prosecution under MEJA for any offense committed while working overseas without any qualifications. See id. § 3267(l)(A)(iii)(I). This suggests DOD contractors and their employees are subject to MEJA for crimes committed while on or off duty. The same is not true for non-DOD contractors though. If the perpetrator of a crime is an employee or contractor of any federal agency other than the DOD, he is subject to MEJA only “to the eoetent [his] employment relates to supporting the [DOD’s] mission.” Id. § 3267(l)(A)(iii)(II) (emphasis added). The phrase “to the extent” does no work unless it implies the criminal liability of non-DOD contractors is more limited than DOD contractors. After all, the word “extent” is defined as “the range (as of inclusiveness or application) over which something extends.” Webster’s Third New International Dictionary Unabridged 805 (1993). Moreover, the Supreme Court has *833 taken a similar view of this phrase when interpreting its statutory meaning. See John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank, 510 U.S. 86, 104-05, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (describing “to the extent” as “words of limitation” in a statute).
Accordingly, if MEJA targets contractors (or their employees) performing specific military roles, it makes little sense to turn our inquiry into an essentially all-or-nothing analysis. However, this is precisely the effect of concluding that MEJA applies to all of a federal contractor’s conduct for the duration of the time that some aspect of that contractor’s employment supports the DOD’s mission. In situations such as this case—where the mission of the DOD is characterized to broadly encompass all activities related to nation-building—the limitation the Court purports to create is virtually boundless. Instead, the more logical reading of the statute is that a non-DOD contractor is subject to MEJA only when a specific task being performed by that contractor is integral to the DOD’s mission. Had Congress wished MEJA to apply more broadly to non-DOD contractors, it could have substituted the word “if’ for the phrase “to the extent” to give MEJA the expansive wording necessary to achieve such a result. See id. (contrasting the word “if’ with the phrase “to the extent”); see also In re Silveira, 141 F.3d 34, 36 (1st Cir. 1998) (“If Congress intended for [the statute at issue] to be an ‘all-or-nothing’ matter, one might wonder why the provisions’ drafters chose to use the connective phrase ‘to the extent that,’ in lieu of the word ‘if,’ which obviously would have been a simpler construction.”). To hold this difference of language is nothing more than a “temporal limitation,” Maj. Op. at 780, ignores the distinction Congress made between those who work directly for the DOD and those who do not.
Moreover, the Court’s interpretation goes beyond the problem Congress was attempting to solve when it amended MEJA in 2004. As noted by the Court, Congress sought to amend MEJA in response to the atrocities committed by Interior Department contractors at the Abu Ghraib prison in Baghdad. Maj. Op. at 779. These contractors working in Abu Gharib were soldiers in all but name, and they were directly assisting the DOD in running a prison for detained enemy combatants. See Saleh v. Titan Corp., 580 F.3d 1, 6-7 (D.C. Cir. 2009) (stating the Abu Ghraib contractors were “integrated [with the military] and performing a common mission with the military under ultimate military command”). Viewed with this context in mind, it is clear that what Congress sought to do when it amended MEJA was to assure that contractors of any federal agency who were performing tasks conventionally done by soldiers could not elude U.S. jurisdiction. Creating criminal liability for all federal employees or contractors whose employment relates—even tangentially so—to the DOD’s mission goes beyond a plain reading of the text. Because we are to “scrupulously confine [our] own jurisdiction to the precise limits which (a federal) statute has defined,” Victory Carriers, Inc. v. Law, 404 U.S. 202, 212, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971) (quoting Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1934)), we must use extreme caution when expanding our jurisdiction—particularly when doing so results in our criminal law applying extraterritorially.
Here, I believe Congress said what it meant and meant what it said, see Conn. Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992), and I would not dismiss the distinctions made in the text in favor of aspirational goals set forth by the statute’s sponsors. See Maj. Op. at 779-80 (citing Senator *834 Schumer’s floor statement declaring MEJA was amended to address “a dangerous loophole in our criminal law that would have allowed civilian contractors who do the crime to escape doing the time”). The Court may be correct that Congress intended for MEJA’s 2004 amendment to treat DOD and non-DOD contractors and their employees exactly the same when a non-DOD contractor’s employment relates to the DOD’s mission, but “[i]t is not for us to rewrite the statute so that it covers ... what we think is necessary to achieve what we think Congress really intended.” Lewis v. City of Chicago, 560 U.S. 205, 215, 130 S.Ct. 2191, 176 L.Ed.2d 967 (2010). If the government truly desires this result, the proper course of action is to petition Congress to amend the statute, not advocate for courts to read problematic language out of its text.
Because MEJA’s text compels the conclusion that Congress meant to treat DOD and non-DOD employees and contractors differently, the next inquiry is to determine which actions of non-DOD contractors are subject to MEJA and which are not. The text once again provides a clear .answer: only crimes committed while “employed by ... the Armed Forces outside the United States” falls within MEJA’s purview. 18 U.S.C. § 3261(a)(1). MEJA specifically provides non-DOD contractors are only “employed by ... the Armed Forces” for the purposes of the statute when, though acting within the scope of their employment, they are “supporting the mission of the [DOD].” Id. §§ 3261, 3267. The phrase “relating to” is “deliberately expansive” and must be given broad scope. Maj. Op. at 780. However, its broad scope is not so expansive as to swallow up the “words of limitation” immediately preceding them. See John Hancock Mut. Life Ins. Co., 510 U.S. at 104-05, 114 S.Ct. 517. Instead, these competing phrases must be balanced in ways that give both full meaning. Therefore, MEJA logically encompasses those actions taken by non-DOD employees pursuant to their employment that either directly or indirectly support the DOD’s mission. The statutory framework focuses on military employment and thus limits the scope of jurisdiction not just temporally but factually. This interpretation gives full meaning to the broad language of the text without making virtually all potential crimes committed by a non-DOD employee subject to the federal criminal law. The proper question is whether the Defendants were either directly or indirectly supporting the DOD when they entered Nisur Square on the day of the incident.
B.
Under this Court’s precedent, we examine the jury findings for each element of MEJA under the deferential sufficiency-of-the-evidence standard. United States v. Williams, 836 F.3d 1, 7 (D.C. Cir. 2016). In doing so, we determine “whether the evidence, considered in the light most favorable to the government, was sufficient to permit a rational trier of fact to find all of the essential elements of the [statute were met] beyond a reasonable doubt.” United States v. Wilson, 240 F.3d 39, 43 (D.C. Cir. 2001). Here, the government has arguably met its burden. I do not join the Court in holding that any actions deemed to facilitate rebuilding the war-torn nation of Iraq automatically relates to the DOD’s mission based on the text and history discussed above. For this reason, I also find the evidence of the Defendants performing other tasks to support the DOD—such as assisting distressed military units and training Army escorts, Maj. Op. at 782—to be of doubtful relevance in determining whether the Defendants were supporting the DOD on the day of the Nisur Square incident.
*835 However, neither of these pieces of evidence are necessary to uphold the jury’s finding under the deferential sufficiency of the evidence standard, and we need not decide whether they would be sufficient on their own to meet MEJA’s criteria. As posited by the Court, the Defendants’ employment—providing diplomatic security, for the Department of State—indirectly supported the DOD’s mission by allowing military personnel previously responsible for providing State Department security to concentrate exclusively on the DOD’s rebuilding mission. Maj. Op. at 782-88. The relatively small size of America’s active, volunteer military and the breadth of its commitments may blur the lines, but it does not erase them. Although statements from Deputy Secretary of Defense Gordon England unequivocally stating that the Defendants were not supporting DOD’s mission contradicted the prosecution’s narrative, JA 2919-20, 2932, 2936, contrary evidence is not enough to overcome this deferential standard. While I would interpret MEJA more narrowly and find the question close, arguably sufficient evidence existed for a rational juror to conclude that MEJA applied to the Defendants.
II.
One question remains. Did the district court properly instruct the jury . on MEJA’s application to this case? When examining a challenge to jury instructions, we must determine “whether, taken as a whole, the [district court’s] instructions accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards.” United States v. DeFries, 129 F.3d 1293, 1304 (D.C. Cir. 1997). Because an “improper instruction on an element of the offense violates the Sixth Amendment’s jury trial guarantee,” it is a reversible error requiring a new trial unless the error was harmless. Neder v. United States, 527 U.S. 1, 12, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The burden is on the government to prove the error was harmless beyond a reasonable doubt. Wilson, 240 F.3d at 44.
Here, the district court interpreted MEJA as an all-or-nothing proposition. When explaining how MEJA should apply to the case, the court emphasized the broad nature of certain words in the text by defining the word “relates” to mean “a connection with” and defining “supporting” to mean “to promote the interest or cause of something or someone.” JA 3293. After giving these definitions, the culmination of the instruction advised that employment relating to supporting the DOD’s mission included a contractor of “any federal agency whose employment in the Republic of Iraq bears some relationship to supporting the mission of the Department of Defense in that country.” Ibid. While the instruction did contain the phrase “to the extent,” the presence of this phrase does little work because the overall framing of the issue is erroneous. By describing MEJA in this manner, the district court, essentially read the limiting effect of the phrase “to the extent” right out of the statute and instead substituted “if’ in its place. Moreover, this expansive view effectively eliminates the connection to military employment. As discussed above, this is a dubious interpretation of the statute.
At the jury instruction stage, the imprecision inherent in a sweeping view of the DOD’s mission becomes apparent. The jury instruction, if erroneous, was prejudicial because it affected a central issue in a close case where persuasive evidence was presented by both the prosecution and the defense. See Williams, 836 F.3d at 16 (reversing a murder conviction under MEJA because a misstatement of the law by the prosecution during its closing statement *836 involved a “central and close issue in the case” that was “insufficiently cured”). Because the question of whether MEJA applied to the Defendants was a threshold issue for each conviction, there is no issue more central to the entire case than this. Furthermore, even if sufficient evidence existed to find jurisdiction under MEJA in this case, the same would be true if the jury had reached the opposite conclusion based upon Deputy Secretary England’s testimony and the representations he made that the Defendants were not supporting the DOD’s mission, see JA 2953, 3843, 3858. Thus, the importance of an accurate statement of the law cannot be gainsaid.
However, given the district court’s instructions, it was entirely possible for the jurors to begin deliberations believing that if any aspect of the Defendants’ employment related to supporting the DOD’s mission, then any supporting action taken during the course of that employment made the Defendants subject to MEJA. Accordingly, the jurors could find MEJA applied solely on the basis of actions taken during the course of the Defendants’ employment—even actions completely unrelated to the events that transpired in Nisur Square, such as providing assistance to distressed military units or training Army security escorts. This is a significantly different calculus than attempting to determine if the Defendants’ action on the day of the Nisur Square incident related to supporting the DOD’s mission. The difference is stark. The jury conceivably could have reached a different conclusion had it been correctly instructed. At a minimum, the government cannot prove beyond a reasonable doubt the erroneous jury instruction was harmless error. See Wilson, 240 F.3d at 44. Therefore, I would have reversed the Defendants’ convictions and remanded the case for a new trial.
III.
The question of how our criminal justice system should treat private contractors who commit crimes overseas in war time is a difficult one. However, Congress has made the determination that such individuals should be held responsible for their actions in federal courts if they either work for the military or commit a crime during the performance of a task related to supporting the military, such as the atrocities committed at Abu Ghraib. Today’s opinion expands MEJA beyond the limits defined by this history and clearly laid out in the text. Because it is not possible to conclude, beyond a reasonable doubt, that the erroneous instruction did not improperly influence the ultimate outcome of the case, I respectfully dissent from this portion of the Court’s decision.