# IN THE SUPREME COURT OF TEXAS

════════════

No. 12-1013

════════════

SCHLUMBERGER TECHNOLOGY CORPORATION, PETITIONER,

v.

CHRISTOPHER ARTHEY AND DENISE ARTHEY, RESPONDENTS

═══════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

═══════════════════════════════════════════════════════════

**Argued January 8, 2014**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

JUSTICE GREEN did not participate in the decision.

Under Texas law, a social host has no duty to prevent someone from drinking and driving.[1]

But in this case, the driver became intoxicated on a small, chartered fishing boat during a business

retreat, and plaintiffs contend that their action against the host is governed by federal maritime law,

---

[1] *Reeder v. Daniel*, 61 S.W.3d 359, 361-362, 364-365 (Tex. 2001) (refusing to recognize a negligence per se or ordinary negligence cause of action against social hosts for making alcohol available to guests under eighteen years old); *Smith v. Merritt*, 940 S.W.2d 602, 605, 608 (Tex. 1997) (concluding that social hosts owed no common law tort duty to a nineteen-year-old guest's passenger to refrain from providing alcohol to the guest and that hosts were not negligent per se); *Graff v. Beard*, 858 S.W.2d 918, 921-922 (Tex. 1993) (holding that a social host has no duty to a third party to prevent an adult guest from drinking and driving); TEX. ALCO. BEV. CODE §§ 2.01-.03 (imposing liability only on commercial providers); *cf. Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 311 (Tex. 1983) (holding that an employer who affirmatively exercises control over an incapacitated employee must exercise ordinary care to prevent the employee from causing an unreasonable risk of harm to others).

which, they argue, would recognize liability.[2]  For maritime law to apply, the action must fall within admiralty jurisdiction, and under the tests prescribed by the United States Supreme Court in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,*[3] it does not.  Accordingly, we reverse the judgment of the court of appeals[4] and render judgment for petitioner.

## I

To foster good business relations, Schlumberger Technology Corp. invited employees from some of its business partners, along with several of its salesmen, to a retreat at Schlumberger's expense at the Shoal Grass Lodge in Aransas Pass near the Gulf of Mexico.  From Wednesday afternoon to Friday afternoon, Schlumberger had the Lodge provide the twelve guests with rooms, meals, an open bar, and a total of eight to ten hours of bay fishing from small boats with professional guides.  The Lodge did not provide alcoholic beverages on the boats, but Schlumberger's outfitter, who arranged the event, could "make it happen", and did, at guests' request.

One guest was David Huff, an employee of Petrobras America, Inc., a company that did millions of dollars of business with Schlumberger.  On Friday morning, Huff, a Schlumberger employee named William Ney, and a guide left the Lodge on a fishing boat between 9:00 and 10:00. Huff and Ney did not remember whether there was alcohol on the boat that morning, though Huff assumed so, and there had been the day before.  Ney recalled that Huff was drinking something from

---

[2] We express no opinion on the substantive maritime law.

[3] 513 U.S. 527, 534 (1995).

[4] 398 S.W.3d 831 (Tex. App.—Corpus Christi–Edinburg 2012).

a can wrapped in a "koozie",[5] though Huff slept most of the time they were out. The boat returned to the Lodge between 12:30 and 1:00 p.m., and Huff left to drive home.

At 2:34 p.m., some 40 miles from the Lodge, Huff crossed into oncoming traffic and struck a motorcycle ridden by Christopher and Denise Arthey. Both Artheys were severely injured, and as a result, lost their left legs. Other motorists had seen Huff driving erratically, but the investigating officer did not smell alcohol on his breath. Huff was taken to a hospital where, three hours after the accident, his blood alcohol content tested 0.25, more than three times the legal limit.[6] An expert retained by the Artheys extrapolated Huff's blood alcohol content at the time of the accident to be 0.31. According to the expert, Huff could not have drunk enough after leaving the boat to reach that level and yet still continue to function, and thus he must have been drinking on the boat. Huff conceded he was "significantly intoxicated" at the time of the accident. He pleaded guilty to intoxication assault, a third degree felony,[7] and was given a probated sentence by a jury.

The Artheys sued Schlumberger,[8] alleging that it negligently allowed Huff to drink excessively. As noted, Texas law does not recognize such social host liability,[9] but the Artheys

---

[5] A koozie is a fabric or foam device that wraps around a beverage container, providing thermal insulation.

[6] Legal intoxication is 0.08 grams of alcohol per deciliter of blood. TEX. PEN. CODE § 49.01(1), (2)(B).

[7] *Id.* § 49.07.

[8] They also sued Huff, the Lodge, the fishing guide, and others.

[9] *Supra* note 1. In the trial court, in their pleadings and their response to Schlumberger's motion for summary judgment, the Artheys asserted that Schlumberger was liable under the Texas Dram Shop Act as a commercial provider and under Texas common law. The trial court granted summary judgment without specifying its grounds. On appeal, the Artheys argued that Schlumberger was liable as a commercial provider under the Act because its agent — the fishing trip outfitter — provided or served alcohol to an intoxicated Huff. The court of appeals reversed without reaching the issue. 398 S.W.3d at 841 n.5. In this Court, petitioner Schlumberger argues that it owes no duty and cannot be held liable under the Texas Dram Shop Act, and the Artheys' response does not address any state law claim. We agree that

3

assert that federal maritime law applies because Huff became intoxicated while on the fishing boat the morning of the accident. The Artheys contend that maritime law would impose liability in these circumstances. The trial court granted summary judgment for Schlumberger, and the Artheys appealed. A divided court of appeals reversed and remanded, concluding that maritime law applies and that fact issues precluded summary judgment.[10]

We granted Schlumberger's petition for review.[11]

## II

## A

The parties agree that for maritime law to apply, the Artheys' action must lie within admiralty jurisdiction.[12] The test for determining admiralty jurisdiction over tort claims has evolved, as recounted by the United States Supreme Court in *Jerome B. Grubart, Inc. v. Great Lakes Dredge*

---

Schlumberger is not a "provider" within the meaning of the Act. *See* TEX. ALCO. BEV. CODE § 2.01 (1) ("'Provider' means a person who sells or serves an alcoholic beverage under authority of a license or permit issued under the terms of this code or who otherwise sells an alcoholic beverage to an individual."). The trial court therefore did not err in granting summary judgment on this ground.

[10] 398 S.W.3d at 837, 841.

[11] 57 Tex. Sup. Ct. J. 53 (Nov. 22, 2013).

[12] *See Texaco Ref. & Mktg., Inc. v. Estate of Dau Van Tran*, 808 S.W.2d 61, 64 (Tex. 1991) ("Where applicable *and* properly invoked, general maritime law preempts state causes of action and remedies, consistent with the longstanding desire of Congress and the judiciary to achieve uniformity in the exercise of admiralty jurisdiction pursuant to the U.S. Constitution, art. 3, § 2, cl. 1. The 'saving to suitors' clause of 28 U.S.C. 1333(1) permits state courts to adjudicate maritime actions 'constrained by the "reverse-*Erie*" doctrine which requires that substantive remedies afforded by States conform to governing federal maritime standards.'") (citations omitted); *see also Stier v. Reading & Bates Corp.*, 992 S.W.2d 423 (Tex. 1999).

*& Dock Co.*[13] Traditionally, "whether the tort occurred on navigable waters" was conclusive.[14] "If it did, admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist."[15] Now,

> a party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.[16]

Schlumberger is entitled to summary judgment only if it established as a matter of law that, under these tests, the Artheys' action is not within admiralty jurisdiction.

## B

The evidence clearly presents a factual dispute over whether the Artheys can satisfy the location test. Schlumberger argues that there is no evidence that Huff was drinking alcoholic beverages on the boat the morning of the accident, or even that alcoholic beverages were present, or if they were, that Schlumberger furnished them. But the Artheys' expert's analysis of the level of Huff's intoxication at the time of the accident is some evidence that he must have been drinking on the boat. And even if there is no evidence that Schlumberger provided alcoholic beverages on Huff's boat Friday morning, Ney was present and could see Huff's condition. If Schlumberger had

---

[13] 513 U.S. 527, 531-534, 547-548 (1995) (holding that district court had admiralty jurisdiction over barge owner's Limitation Act suit).

[14] *Id.* at 531-532.

[15] *Id.*

[16] *Id.* at 534 (citations, quotation marks, and related punctuation omitted).

a duty under maritime law to prevent Huff from drinking just before driving home, Ney's failure to take any action is at least some evidence that the duty was breached on the boat.[17]

**C**

Applying the two-part connection test is more difficult. Both parts of the test require an examination of the general character of the incident and the activity giving rise to it, not the specifics.[18]

> This focus on the general character of the activity is, indeed, suggested by the nature of the jurisdictional inquiry. Were courts required to focus more particularly on the causes of the harm, they would have to decide to some extent the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question.[19]

The first part of the connection test asks whether an incident, described "at an intermediate level of possible generality", has a potentially disruptive impact on maritime commerce.[20] The second part asks

> whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity[, that is] whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand.[21]

---

[17] Schlumberger does not question that the bay where the party was fishing was navigable, or that any liability for a tort falling within admiralty jurisdiction would extend to the injuries and damages suffered by the Artheys on land. *See* 46 U.S.C. § 30101(a) ("The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.").

[18] *Grubart*, 513 U.S. at 538-540.

[19] *Sisson v. Ruby*, 497 U.S. 358, 364-365 (1990).

[20] *Grubart*, 513 U.S. at 538-539.

[21] *Id.* at 539.

6

*Grubart* derived this connection test from two prior cases, *Foremost Insurance Co. v. Richardson*[22] and *Sisson v. Ruby*,[23] and we look to those three cases for guidance in applying the test.

In *Foremost*, two small "pleasure boats" collided, one used for riding and water-skiing and the other a bass boat.[24] The Supreme Court described the incident as "a collision between boats on navigable waters" and the activity giving rise to the incident as "navigation".[25] The Court rejected arguments that a collision between boats not engaged in commerce could not disrupt commerce, and that the use of the boats was not a traditional maritime activity to which uniform rules of admiralty should apply.

> The federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually *engaged* in commercial maritime activity. This interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct. . . . For example, if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity. Furthermore, admiralty law has traditionally been concerned with the conduct alleged to have caused this collision by virtue of its "navigational rules — rules that govern the manner and direction those vessels may rightly move upon the waters." The potential disruptive impact of a collision between boats on navigable waters, when coupled with the traditional concern that admiralty law holds for navigation, compels the conclusion that this collision between two pleasure boats on navigable waters has a significant relationship with maritime commerce.[26]

---

[22] 457 U.S. 668 (1982) (holding that complaint by decedent's beneficiaries, based on a collision between two small vessels, stated a claim within the admiralty jurisdiction of the federal courts).

[23] 497 U.S. 358 (1990) (holding that district court had admiralty jurisdiction over yacht owner's Limitation Act claim).

[24] *Foremost*, 457 U.S. at 670-671; *id.* at 678 (Powell, J., dissenting).

[25] *Id.* at 675.

[26] *Id.* at 674-675 (emphasis in original).

The Court added:

> Not every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction. In [*Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249 (1972)], for example, we concluded that the sinking of the plane in navigable waters did not give rise to a claim in admiralty even though an aircraft sinking in the water could create a hazard for the navigation of commercial vessels in the vicinity. However, when this kind of potential hazard to maritime commerce arises out of activity that bears a substantial relationship to traditional maritime activity, as does the navigation of the boats in this case, admiralty jurisdiction is appropriate.[27]

In *Sisson*, a yacht docked at a marina caught fire around its washer/dryer unit and damaged neighboring vessels and the marina.[28] The Supreme Court described the incident as "a fire on a vessel docked at a marina on navigable waters".[29] This, the Court said, "plainly satisf[ies] the requirement of potential disruption to commercial maritime activity."[30] The Court described the activity giving rise to the incident as "the storage and maintenance of a vessel at a marina on navigable waters."[31]

> Clearly, the storage and maintenance of a vessel at a marina on navigable waters is substantially related to "traditional maritime activity" given the broad perspective demanded by the second aspect of the test. Docking a vessel at a marina on a navigable waterway is a common, if not indispensable, maritime activity. At such a marina, vessels are stored for an extended period, docked to obtain fuel or supplies, and moved into and out of navigation. Indeed, most maritime voyages

---

[27] *Id.* at 675 n.5.

[28] *Sisson*, 497 U.S. at 360; *see also Grubart*, 513 U.S. at 541 (*Sisson* did not consider the activities of the washer/dryer manufacturer; the actions of the boat owner supplied the necessary substantial relationship to traditional maritime activity).

[29] *Sisson*, 497 U.S. at 363.

[30] *Id.*

[31] *Id.* at 365.

begin and end with the docking of the craft at a marina. We therefore conclude that, just as navigation, storing and maintaining a vessel at a marina on a navigable waterway is substantially related to traditional maritime activity.[32]

In *Grubart*, a contractor using a crane on a barge to replace wooden pilings around the piers of several bridges across the Chicago River punched through the river bottom into a freight tunnel, resulting in the flooding of several buildings.[33] The Supreme Court described the incident as "damage by a vessel in navigable water to an underwater structure".[34] "So characterized," the Court continued,

> there is little question that this is the kind of incident that has a "potentially disruptive impact on maritime commerce." As it actually turned out in this suit, damaging a structure beneath the riverbed could lead to a disruption in the water course itself [because of an eddy that formed in the river above the leak]; and, again as it actually happened, damaging a structure so situated could lead to restrictions on the navigational use of the waterway during required repairs.[35]

The Supreme Court described the activity leading to the incident as "repair or maintenance work on a navigable waterway performed from a vessel".[36] "Described in this way," the Court explained, "there is no question that the activity is substantially related to traditional maritime activity, for barges and similar vessels have traditionally been engaged in repair work similar to what Great Lakes contracted to perform here."[37]

---

[32] *Id.* at 367.

[33] *Grubart*, 513 U.S. at 529-530.

[34] *Id.* at 539.

[35] *Id.*

[36] *Id.* at 540.

[37] *Id.*

9

In all three cases, the Supreme Court concluded that the connection test for admiralty jurisdiction had been met.  Applying the same approach, we reach the opposite conclusion in this case.

The incident here, generally described, is the consumption of alcoholic beverages by guests aboard small, chartered fishing boats on navigable waters.  The question, according to *Grubart*, is "whether the incident [can] be seen within a class of incidents that posed more than a fanciful risk to commercial shipping."[38]  It cannot.  Such consumption poses no threat to navigation because the guests do not operate the boat; the guide does.  Indeed, as actually happened in this case, a guest consuming alcoholic beverages may be likely to fall asleep, and thus be unlikely to disrupt anything.  Should a guest fall overboard because of his impairment, he is likely to be rescued immediately by others on the boat or not at all.  In either event, the possibility of the need for rescue operations disrupting water traffic in the area is remote.  Drinking while fishing, if not a time-honored tradition, is certainly common enough that, if it posed more than a fanciful risk to commercial shipping, reports of disruptions to commerce would abound.  We think the incident here clearly does not meet the first part of the connection test.

For the second part, the activity in this case was the supervision of the consumption of alcoholic beverages by a guest aboard a small, chartered fishing boat on navigable waters.  We do not think such activity could fairly be characterized as substantially related to a traditional maritime activity, but even if it could, there is no apparent need for applying special, uniform admiralty rules in all situations rather than individual states' laws.  The need to monitor guests' drinking on small

---

[38] *Id.* at 539.

fishing boats does not approach the need for standard navigation rules, which the Supreme Court found compelling in *Foremost*.[39] Moreover, as in this case, guests may ordinarily be expected to spend a relatively small part of their time on the boat. Monitoring alcohol consumption on a boat does nothing to control a guest's consumption before boarding and after disembarking. The activity in this case, we think, does not satisfy the second part of the connection test.

The Artheys cite five cases suggesting that allegations of failure to monitor the alcohol consumption of gamblers on floating casinos[40] and seamen on ships[41] fall within admiralty jurisdiction. Without expressing a view on whether those cases were correct insofar as they analyzed the applicability of admiralty jurisdiction, we note that, if there is a significant risk of disruption of maritime commerce posed by the unmonitored consumption of alcoholic beverages on large commercial vessels, that risk is far greater than when the consumption is by a guest on a small fishing boat. And if monitoring consumption is substantially related to the operation of such large

---

[39] *Foremost*, 457 U.S. at 675.

[40] *Horak v. Argosy Gaming Co.*, 648 N.W.2d 137, 145-146 (Iowa 2002) (stating that a claim for damages caused by a driver who became intoxicated on a riverboat casino was "arguably" within admiralty jurisdiction); *Young v. Players Lake Charles, L.L.C.*, 47 F. Supp. 2d 832, 834-835 (S.D. Tex. 1999) (stating, although admiralty jurisdiction was not in dispute, that "the incident forming the basis of this action" — a car wreck caused by a driver who became intoxicated aboard a riverboat casino — "satisfies all the requirements of admiralty jurisdiction"); *Bay Casino, LLC v. M/V Royal Empress*, 199 F.R.D. 464, 466 (E.D.N.Y. 1999) (stating that "the incident underlying the proposed cause of action" — against a drunk driver who became intoxicated on a gambling cruise — "satisfies the requirements of admiralty jurisdiction").

[41] *Reyes v. Vantage Steamship Co.*, 609 F.2d 140 (5th Cir. 1980) (treating as within admiralty jurisdiction, without discussion, a seaman's widow's claim for the death of her husband who became intoxicated on board a steamship and jumped overboard, trying to swim to a nearby buoy); *Thier v. Lykes Bros., Inc.*, 900 F. Supp. 864 (S.D. Tex. 1995) (treating as within admiralty jurisdiction, without discussion, a seaman's claim for injuries while driving to dinner with the captain of a merchant marine vessel who had become drunk on board).

11

vessels, a traditional maritime activity warranting the application of general admiralty rules, the same cannot be said of small fishing boats.

We therefore conclude that the undisputed facts establish, as a matter of law, that the Artheys cannot meet the connection test required by *Grubart* for a claim in admiralty, and consequently, maritime law does not govern their claim against Schlumberger.

**III**

Social host liability for water recreational activities is, as the United States Supreme Court has said in a related context, at "the intersection of federal and state law."[42] Extending maritime law shoreward

> intrude[s] on an area that has heretofore been reserved for state law [and] would raise difficult questions concerning the extent to which state law would be displaced or preempted . . . . In these circumstances, we should proceed with caution in construing constitutional and statutory provisions dealing with the jurisdiction of the federal courts. As the Court declared in *Healy v. Ratta*, 292 U.S. 263 (1934), . . . "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which (a federal) statute has defined."[43]

Huff's consumption of alcoholic beverages on navigable water was only a part of a business retreat, during which he consumed far more on land. Schlumberger's conduct occurred almost entirely on land. Applying maritime law to the Artheys' claim is not important to the uniformity of rules governing maritime commerce and makes state law regarding social host liability non-uniform.

---

[42] *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 211-212 (1971) (citation omitted) (refusing to apply maritime law to a longshoreman's claim for injuries on a dock, cited by *Exec. Jet Aviation Inc. v. City of Cleveland*, 409 U.S. 249, 272-273 (1972)).

[43] *Victory Carriers*, 404 U.S. at 212.

Invoking admiralty jurisdiction in this case forces a distinction between business retreats at hunting lodges and those at fishing lodges when in fact there is none. Social host liability in all such situations is more a concern of state law. Today's decision is faithful to the principles of admiralty jurisdiction and also respectful of the State's authority to prescribe legal policy in situations like the one presented.

*     *     *     *     *

The Artheys' injuries are, of course, as unquestionably tragic as Huff's conduct was reprehensible, and they have had recourse against him. We are constrained, however, to determine admiralty jurisdiction using *Grubart*'s tests, and having done so, we conclude that such jurisdiction does not exist in this case. The judgment of the court of appeals is therefore reversed and judgment rendered for Schlumberger.

_____

Nathan L. Hecht
Chief Justice

Opinion delivered: June 20, 2014